**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Melissa Vento, et al., | No. CV-22-00098-TUC-BGM |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

Before the Court is Defendant United States of America's Motion for Summary Judgment. (Doc. 47.) For the reasons that follow, Defendant's motion is GRANTED IN PART AND DENIED IN PART. Defendant's motion as to Plaintiff Daniel Wolverton's state-law battery claim is GRANTED. Defendant's motion as to Plaintiff Melissa Vento's state-law battery claim is DENIED. Plaintiff Vento's state-law battery claim against the United States under the Federal Tort Claims Act survives and may proceed to trial.

### BACKGROUND[1]

For married Plaintiffs Melissa Vento and Daniel Wolverton, traveling to Mexico for a dental appointment during the COVID-19 pandemic proved to be more eventful than expected. On March 19, 2021, after visiting Smile Dental in Nogales, Sonora, Mexico, the pair attempted to return to the United States via the DeConcini Pedestrian Port of Entry in Nogales, Arizona. (Docs. 48, ¶¶ 1, 3; 48-6 at 8:3-4.) At the Port's primary inspection point, the couple were interviewed by Customs and Border Protection ("CBP") Officer Ray

---

[1] The facts in the background section are stated in the light most favorable to Plaintiffs.

Sablan, who referred them to the Port's secondary inspection point for additional questioning. (Docs. 48, ¶ 2; 48-3, ¶¶ 5-6.) In the agency's centralized electronic database, Sablan noted that it was Vento's first time crossing the border from Mexico, that she had crossed the border to attend her first dental appointment, and that she was not standing still. (Doc. 48-3 at 10.) At the time of the couple's crossing, COVID-19 related restrictions were in place and only U.S. citizens or legal permanent residents were allowed to enter the United States. (Doc. 48, ¶ 4.) It is uncontested that Plaintiffs are United States Citizens.

Due to alleged inconsistencies in the couple's travel itinerary and Vento's inability to stand still, Vento and her husband were taken to private rooms by CBP officers to be searched.[2] (*Id*. ¶ 8.) Vento was taken to a private room and was searched by Officer Brittany Mercado. (*Id.* ¶ 11.) Mercado was joined by Officer Yvette Alvarez, who witnessed the search. (*Id.* ¶ 18.) At the time of the search, Vento was wearing thin, cotton, yoga pants, and was not wearing underwear. (Doc. 48-7 at 5:12-24.)

Mercado states that she employs a systematic practice for conducting searches at the border. (Doc. 48-8 at 6:16-19.) Her practice is to have the traveler face and place her hands on the wall. (*Id*. at 9:4-5.) The traveler is instructed to spread her feet apart, squat five times, and cough on the last squat. (*Id*. at 9:5-9; 13:13-15.) Mercado then pats down the traveler from head to toe. (*Id*. at 10:11-15.) When Mercado searches a traveler's groin,[3] she positions her hand in a "blade style" with her thumb tucked into her palm and starts at the center of the traveler's groin. (*Id*. at 11:1-2; 13:4-12; 14:14-22.)

Vento contends that during her search, Mercado neglected to pat down her arms, chest, or legs, and instead searched only her groin. (Doc. 48-7 at 8:13-23.) Vento asserts that during the search of her groin, Mercado penetrated her vagina. (*Id*. at 9:5-7, 10:1-4; 56-1, ¶ 6; 57, ¶ 1 at 5.) Both Mercado and Alvarez admit that they have no independent

---

[2] Plaintiffs contest that this was the motivation behind their search and instead assert that the more likely explanation is that officers were suspicious of a white man traveling with a Latina woman. (*See* Doc. 57, ¶ 8.)

[3] Under CBP policy, female officers are charged with searching female travelers and male officers are charged with searching male travelers. (*See* Doc. 48-12 at 12:21-23.)

- 2 -

recollection of the search. (Docs. 48-8 at 6:13; 48-2, ¶ 13.)

According to Daniel Wolverton, the search of his person was also a traumatic experience. (Doc. 48-6 at 14:3.) Wolverton was taken to a private room and was searched by CBP Supervisor Terrence Lilly. (Doc. 48, ¶ 25.) Lilly states that he uses a systematic practice for body searches that includes having the traveler face and place his hands on the wall. (*Id.* ¶ 26.) Lilly then proceeds to pat down the traveler's body from the top of the shirt to the belt, followed by the lower body. (*Id.*) Lilly asserts that he uses the back of his hand to search the buttocks and groin area, as well as running his hand up the right and left leg just below the groin. (*Id.*) Lilly states that he uses "sufficient pressure" to detect the presence of contraband on a traveler's body. (*Id.*) At the time of his search, Wolverton had an inguinal hernia, in the form of a silver dollar-sized lump, on the left side of his groin, where his leg met his lower belly. (Doc. 48-6 at 20:9-22:17.) Wolverton states that Lilly did an excessive search of his groin by performing two full circles around his genitals and using his fingers to examine all of the spaces between Wolverton's genitals. (*Id.* at 11:4-8.) Wolverton asserts that Lilly used forceful pressure to search his groin, which aggravated his hernia. (*Id.* at 13:6-10; 18:2-7.)

After the searches of Vento and Wolverton, the couple asked for supervisors and protested their treatment until they were forced to leave by CBP officers. (Docs. 56-1, ¶ 9; 56-2, ¶ 10.) Plaintiffs bring the action at hand maintaining one count each of state-law battery against the United States under the Federal Tort Claims Act ("FTCA").[4] After full briefing and oral argument on the Government's motion for summary judgment, this Order follows. (*See* Docs. 47-48, 56-57, 61-63.)

## LEGAL STANDARD

Summary judgment is appropriate where there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it is one "that might affect the outcome of the suit under the

---

[4] At oral argument on Defendant's motion for summary judgment, Plaintiffs conceded that they forfeited their Fourth Amendment *Bivens* claims. (*See* "Counts 1 & 2," Doc. 1 at 5.)

- 3 -

governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and all reasonable inferences are to be drawn in the nonmovant's favor, *Anderson*, 477 U.S. at 255. Additionally, the court does not make credibility determinations or weigh the evidence. *Anderson*, 477 U.S. at 253. The determination of whether a given factual dispute requires submission to a jury is guided by the substantive evidentiary standards that apply to the case. *Id.* at 255.

## DISCUSSION

On summary judgment, the Government raises two arguments to contend that it is entitled to judgment as a matter of law.[5] (Doc. 47 at 5-16.) First, it argues that Plaintiffs' battery claims fail because CBP's searches complied with the Fourth Amendment. (*Id.* at 5-15.) Second, it argues that the discretionary function exception bars Plaintiffs' claims. (*Id.* at 15-16.) The Court addresses these arguments in the order they are presented.

**I.    Battery Under Arizona Law**

Plaintiffs bring their battery claims against CBP officers under the Federal Tort Claims Act, alleging that they were unlawfully touched, the touching was not privileged, the touching was not required for any legitimate purpose, the touching was harmful and offensive, and they suffered emotional and physical injuries as a result. (*See* Doc. 1 at 6-7.) The FTCA makes the federal government liable for certain tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The Act allows the federal government to be sued for monetary damages for personal injury "in accordance with the law of the place where the act or omission occurred." *United States v. Muniz*, 374 U.S. 150, 152 (1963) (quoting 28 U.S.C. § 1346).

---

[5] Plaintiffs' forfeiture of their *Bivens* claims renders the Government's third argument that "Plaintiff[s'] Constitutional Claims Are Not Actionable," moot. (*See* Doc. 47 at 16.)

- 4 -

To succeed on a battery claim under Arizona law, a plaintiff must prove that the defendant "intended to cause harmful or offensive contact with the plaintiff." *Ryan v. Napier*, 425 P.3d 230, 235 (Ariz. 2018). However, conduct that would otherwise subject an individual to liability for battery does not constitute tortious conduct if the individual is privileged to engage in such conduct. *Hinojosa v. City of Terrell, Tex.*, 834 F.2d 1223, 1231 (5th Cir. 1988) (citing Restatement (Second) of Torts § 10 (1965)); *see also* A.R.S. § 13-413. A federal officer conducting a routine search at the border is privileged to use reasonable force to effectuate the search. *See United States v. Ramsey*, 431 U.S. 606, 619 (1977) (observing that border searches "have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside"). Therefore, a battery claim against a federal officer conducting a search at the border is judged under the Fourth Amendment's reasonableness standard. *See Napier*, 425 P.3d at 241 (instructing that claims for excessive force by law enforcement officers should be analyzed under the Fourth Amendment's reasonableness standard); *Mwimanzi v. Wilson*, 590 F. Supp. 3d 231, 260 (D.D.C. 2022) (ruling that the standard for the plaintiff's battery claim arising out of allegations that an officer aggressively fondled him during a search is "similar to the excessive force standard … in the Section 1983 context").

Here, the Government argues that a battery claim asserted against a law enforcement officer acting in her official capacity is akin to an excessive force claim. (Doc. 47 at 6.) It asserts that if the officer's search was reasonable under the Fourth Amendment, then the battery claim must fail because the officer's contact was privileged and the use of force justified. (*Id.*) Plaintiffs argue that the Government's summary judgment motion cannot be granted because there are disputed issues of material fact as to whether Vento was penetrated and as to whether the search of Wolverton was excessive. (Doc. 56 at 8-9.) Construing the evidence in the light most favorable to Plaintiffs, the Court concludes that Wolverton's patdown search was reasonable and that Vento's body cavity search was unreasonable. As such, the border officer that searched Wolverton is not liable for battery, and this claim is dismissed.

### A.    Reasonableness

The Fourth Amendment to the Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. What is reasonable depends upon the circumstances surrounding the search and the nature of the search itself. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). To determine whether a search is reasonable, "the intrusion on the individual's privacy interests must be balanced against [the law enforcement practice's] promotion of legitimate governmental interests." *Cates v. Stroud*, 976 F.3d 972, 979 (9th Cir. 2020) (cleaned up). In making a reasonableness determination, courts are instructed to evaluate "the totality of the circumstances," including: (i) "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted[;]" (ii) "the government's interest in the use of force[;]" and (iii) "the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022) (cleaned up). A court must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The determination of what is reasonable is different at the nation's borders as opposed to its interior. *See Ramsey*, 431 U.S. at 616 ("[S]earches made at the border … are reasonable simply by virtue of the fact that they occur at the border."). "Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya de Hernandez*, 473 U.S. at 537. At an international port of entry, a traveler's right to be left alone fails to prevent the search of his or her person and routine searches are not subject to reasonable suspicion, probable cause, or a warrant. *United States v. Gonzalez-Rincon*, 36 F.3d 859, 864 (9th Cir. 1994). However, strip searches or body-cavity searches are considered nonroutine and must be supported by reasonable suspicion. *Id.* To analyze whether the searches of Vento and Wolverton were reasonable,

the Court distinguishes between routine and nonroutine searches and considers the totality of the circumstances surrounding the search of each person.

### 1.     Nonroutine Body Cavity Search

The Government argues that Mercado's search of Vento was reasonable because it was a routine patdown. (Doc. 47 at 7-11.) However, evidence in the record demonstrates that the search of Vento was neither a patdown nor routine. The United States Court of Appeals for the Ninth Circuit has reiterated that "searches involving extended detention or an intrusive search of a person's body are not routine." *United States v. Bravo*, 295 F.3d 1002, 1006 (9th Cir. 2002). In *United States v. Gonzalez-Rincon*, the court determined that a traveler's detention for an x-ray or monitored bowel movements constitutes a nonroutine search for which reasonable suspicion is required. 36 F.3d 859, 864 (9th Cir. 1994). In *United States v. Vance*, the court declared that requiring "a person to drop his trousers and pull down his underwear is more intrusive than a pat-down search," which also requires increased suspicion. 62 F.3d 1152, 1156 (9th Cir. 1995). And in *United States v. Ramos-Saenz*, the court instructed that the "degree of intrusiveness is a critical factor in distinguishing between routine and non-routine searches," and that a border search goes beyond routine "when it reaches the degree of intrusiveness present in a strip search or body cavity search." 36 F.3d 59, 61 (9th Cir. 1994), *as amended* (Oct. 14, 1994).

Vento twice testified that Mercado penetrated her vagina while searching her groin at the border. (*See* Docs. 48-7, lines 5-7 at 42 ("Q: So you think you felt [Mercado's] thumb go into your vaginal opening? A. I did."); 48-7, lines 1-4 at 49 ("Q. And you said that the officer -- the side of the officer's finger is what came into contact inside your body? A. Yeah.")). Vento also explicitly states that "Officer Mercado's hand … penetrated the vaginal opening and entered my vagina." (Doc. 56-1, ¶ 6.)[6]  Additionally, Mercado's

---

[6] The Court rejects the Government's contention that the sham affidavit rule should apply to Vento's declaration. (*See* Doc. 61 at 8.) There is no indication in the record that her statement directly contradicts her prior deposition testimony. *See Van Asdale*, 577 F.3d at 998-99 (ruling that "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit."); *Mwimanzi v. Wilson*, 590 F. Supp. 3d 231, 254 (D.D.C. 2022) (observing that "deposition

search of Vento's groin occurred after Vento was instructed to squat five times and cough, (*see* Doc. 48-8 at 9:5-11), and Vento asserts that Mercado searched only her groin during the entire encounter (*see* Doc. 48-7 at 8:13-23). Construing the facts in Vento's favor and using CBP's own definition of an intrusive search,[7] the Court finds that Vento was subject to a nonroutine body cavity search.

### 2. Search Unreasonable

While asserting that only "mere suspicion" applied to Mercado's search of Vento, the Government contends that the search was reasonable based on Vento's nervous demeanor and inconsistencies with her travel itinerary. (Doc. 47 at 8.) The Government states that drug smuggling techniques had changed during the COVID-19 pandemic and that there was an increase in the use of pedestrian border crossers to secret drugs in or on their person. (*Id.*) It also argues that an individual purporting to have traveled into Mexico for the first time to obtain dental care during the pandemic without a previously established business relationship creates suspicion of potentially carrying contraband. (*Id.*) Lastly, the Government asserts that a canine alerted on Vento during her crossing, which indicates "a positive finding of narcotics on her person." (*Id.*)

Vento disputes these contentions, arguing that she and her husband presented proof of their dental appointment to officers upon request, officers failed to advise her that there were any discrepancies with her travel itinerary, officers had no reason to suspect that the couple posed any threat to safety, and that at no point did a dog alert to drugs on her person. (Doc. 56 at 4-5.) Vento also argues that despite the rare nature of her secondary search, the multiple pages of incident reports that officers were required to fill out and sign after her search, and the fact that she and her husband protested their abuse until they were thrown out by CBP officers, it is convenient that none of the officers involved has any independent recollection of any of the challenged events in this case. (*Id.* at 5.)

---

testimony from an individual with personal knowledge of the event is competent evidence that can create a genuine issue of fact.").

[7] According to CBP's Personal Search Handbook, a body cavity search is "any … physical intrusion into the … vaginal cavity." (Doc. 48-10 at 18.)

Once again, construing the facts and reasonable inferences in Vento's favor, the Court finds that the Government fails to demonstrate that border officials had reasonable suspicion to conduct a body cavity search of Vento and that manual penetration of Vento's vagina during the search was unreasonable. Plaintiffs' alleged unsubstantiated and suspicious travel itinerary and k-9 alert are contested issues of material fact and Vento's failure to stand still—alone—cannot serve as reasonable suspicion to warrant intrusion into her vaginal cavity. CBP's own handbook dictates that "[o]nly medical personnel may conduct a body cavity search," and that officers are "prohibited from conducting body cavity searches," or "from causing a body cavity search to be conducted at a CBP facility." (Doc. 48-10 at 18.) Considering the totality of circumstances, from the sparse indicia that Vento was carrying contraband to the streamlined manner in which Vento's vaginal area was explored, the Court determines that Vento was subject to an unreasonable search at the border, and the Government's summary judgment motion on the merits of her state-law battery claim is denied.

### 3. Routine Patdown Search Reasonable

Unlike the scenario that confronted his spouse, there is no indication in the record that the search of Daniel Wolverton was anything other than routine. Routine searches of persons at the border "are not subject to any requirement of reasonable suspicion, probable cause or warrant." *Montoya de Hernandez*, 473 U.S. at 538. Such searches are deemed reasonable under the Fourth Amendment "by the single fact that the person or item in question has entered into our country from outside." *Ramsey*, 431 U.S. at 619. "Because a port of entry is not a traveler's home[,] his right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered." *Gonzalez-Rincon*, 36 F.3d at 864 (cleaned up).

A routine patdown search typically entails general body frisks, removal of outer garments or shoes, and emptying of pockets, wallets, or purses. *United States v. Kelly*, 302 F.2d 291, 294 (5th Cir. 2002). CBP's handbook also appears to describe reasonable components of a patdown search. (*See* Doc. 48-10 at 17 (instructing that a patdown search

consists of "[p]atting the hands over the person's clothed body[;] [r]emoving the person's shoes[;] [l]ifting the pant leg or hem of a skirt a few inches[;] [or] removing a belt.")). Here, Supervisor Lilly conducted a patdown search of Wolverton and another male officer witnessed the search. (Doc. 48, ¶¶ 25, 30.) There was no one else in the room except for Wolverton and the two male officers. (*Id.* ¶ 35.) The search was brief, lasting approximately five minutes. (*Id.* ¶ 45.) Wolverton asserts that during the search, Lilly focused on his groin area for two to three minutes, briefly cupped his genitals, and made two full circles around his genitals and then up the groin. (Doc. 48-6 at 11:4-6; 12:13-17; 13:20.) Wolverton states that Lilly used forceful pressure during the search (*id.* at 13:6-7), and that the pressure aggravated his hernia (*id.* at 18:6-7).

While the Court agrees that a two-to-three-minute search of a traveler's groin would invite suspicion, the totality of the circumstances indicates that Wolverton was subject to a reasonable patdown search to which no suspicion was required. The record indicates that Wolverton failed to disclose his preexisting medical condition to Lilly before or during the search, Lilly briefly manipulated Wolverton's genitals to search the area, and he applied reasonable pressure to detect the presence of contraband. Considering the fact that Wolverton had a silver dollar-sized protruding hernia in his lower groin at the time, a reasonable officer in Lilly's position may have suspected the hernia was suspicious and that additional attention to the area was necessary. Even construing the facts and reasonable inferences in Wolverton's favor, he fails to demonstrate that there exists a genuine dispute of material fact that necessitates trial. Accordingly, Wolverton's claim that he was subject to a state-law battery under the FTCA fails as a matter of law, and his claim is dismissed.

**II.     Discretionary Function Exception**

In addition to arguing that Plaintiffs' battery claims fail on their merits, the Government argues that the claims are barred by the discretionary function exception to the FTCA because CBP officers have wide discretion to determine "how to physically pat down an individual, including the amount of pressure to apply to detect potential

contraband." (Doc. 47 at 16.) The discretionary function exception preserves sovereign immunity for any claim concerning a federal employee's "act or omission … in the execution of a statute or regulation … based upon the exercise or performance … [of] a discretionary function or duty … whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy. *Nieves Martinez v. United States*, 997 F.3d 867, 876 (9th Cir. 2021). Where the exception applies, federal subject matter jurisdiction does not exist. *In re Glacier Bay*, 71 F.3d 1447, 1450 (9th Cir. 1995). It is the Government's burden to prove that the discretionary function exception applies. *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992).

In determining whether the discretionary function exception bars the surviving claim, the Court performs a two-step analysis. *Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996). First, the Court analyzes whether the challenged conduct involves an element of judgment or choice. *Id.* The exception does not apply "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Second, if the Court determines that the challenged conduct involves an element of judgment or choice, it then considers "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* The exception protects only conduct based on public policy considerations. *United States v. Gaubert*, 499 U.S. 315, 323 (1991). When a regulation allows a federal employee to act with discretion, it is presumed "that the agent's acts are grounded in policy when exercising that discretion." *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002) (cleaned up).

### A.     Whether Challenged Conduct Discretionary

Here, the challenged conduct is the search of Vento's person. (*See* Doc. 56 at 9 ("Plaintiffs' claim is that … the searches that were performed upon their bodies were excessive and constitutionally unreasonable.")). In addressing the first step of the discretionary function analysis, the Court concludes that Mercado lacked discretion to

perform an invasive search of Vento because such conduct is contrary to clearly established policy and is unsheltered from liability.

### 1. Body Cavity Search Nondiscretionary

To demonstrate that Mercado's search of Vento was discretionary, the Government argues that border officials have wide discretion to determine whether to send border-crossers for secondary inspection and whether to conduct patdown searches. (Doc. 47 at 15.) It adds that a "CBP officer's decision regarding how to physically pat down an individual, including the amount of pressure to apply to detect potential contraband, is also inherently a discretionary act." (*Id*. at 16.) To support these arguments, the Government references *Bradley v. United States*, 164 F. Supp. 2d 437 (D. N.J. 2001), and a declaration by CBP Use-of-Force Instructor Benjamin Sattler. (*Id*. at 15-16.)

In *Bradley*, a federal district court contemplated whether the discretionary function exception barred the plaintiff airline passenger's various tort claims against the government, including battery. 164 F. Supp. 2d at 454. The plaintiff had complained that the search of her person at Newark International Airport by customs inspectors was nonroutine and intrusive because the inspector who conducted the search allegedly pushed on her breasts and the inner and outer labia of her vagina. *Id*. at 450. On the narrow issue of *search selection*, the court ruled that "decisions by [c]ustoms officers regarding whether to single out and search an individual at the border is inherently a discretionary act," which barred the plaintiff's claims. *Id*. at 454.

As it concerns Instructor Sattler's declaration, Sattler references CBP's Personal Search Handbook to outline specific guidelines that officers are to follow when conducting individualized border searches. (*See* Doc. 48-12 at 12-14.) Sattler includes the agency's definition of a "patdown" search and instructs that when performing a patdown, "officers should use private rooms or areas away from the view of the general public[,]" the officer conducting the patdown "must be of the same gender as the person being searched[,]" and that a "witness of the same gender of the person being searched must be present." (*Id*. at 12.) Sattler advises that "[o]fficers must ensure that the [traveler's] dignity and privacy are

respected at all time[s] and should maintain professional and courteous behavior throughout the entire personal search." (*Id*.) Ironically, Sattler includes the proscription that an officer must "not penetrate into any part of the person's body while performing a patdown search." (*Id*. at 13.)

      While Vento concedes that she was taken to a private room, that she was searched by a female officer, and that another female officer witnessed the search, she disputes that her dignity and privacy were respected and insists that Mercado penetrated her vagina. The *Bradley* court was concerned with discretion related to search selection; whereas here, the Court is concerned with whether Mercardo had discretion to perform the search in the manner in which Vento describes. CBP policy mandates that "[o]nly medical personnel may conduct a body cavity search," and that officers are "prohibited from conducting body cavity searches." (Doc. 48-10 at 18.) The fact that Mercado penetrated Vento's vagina and conducted a body cavity search contrary to established policy, precludes application of the discretionary function exception. *See Gaubert*, 499 U.S. at 324 ("If [an] employee violates [a] mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy."); *Loumiet v. United States*, 828 F.3d 935, 941 (D.C. Cir. 2016) (cleaned up) ("The exception thus does not apply to a claim that an agency failed to … act in accord with a specific mandatory directive."); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001) ("[I]nternal guidelines can be an actionable source of a mandatory obligation under the FTCA."). Accordingly, the exception does not bar Vento's battery claim, and the Government's summary judgment motion on this claim is denied.

## CONCLUSION

      After conducting a thorough review of the parties' briefs and the evidence in the record, the Court concludes that the Government fails to demonstrate that it is entitled to judgment as a matter of law on Plaintiff Vento's claim. Construing the facts and reasonable inferences in her favor, the evidence is such that a reasonable jury could return a verdict that Vento was subjected to an unreasonable search that entailed offensive penetration of

her vagina, which constitutes a battery under Arizona law. Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 47) is **GRANTED IN PART AND DENIED IN PART**. Defendant's Motion as to Plaintiff Wolverton's state-law battery claim is **GRANTED**. Defendant's Motion as to Plaintiff Vento's state-law battery claim is **DENIED**. Plaintiff Wolverton's state-law battery claim is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that this matter is scheduled for a Pretrial Conference on Wednesday, November 29, 2023, at 1:30 p.m. in Courtroom 3C at the Evo A. DeConcini United States Courthouse, 405 W. Congress Street, Tucson, Arizona. The parties are reminded that their Joint Proposed Pretrial Order is due November 24, 2023. (*See* Doc. 28, ¶¶ H-J.)

Dated this 10th day of October, 2023.

Honorable Bruce G. Macdonald
United States Magistrate Judge